IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2003

## CHARLES WESTON ELSEA, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hamilton County**
**No. 236972     Stephen M. Bevil, Judge**

-----

**No. E2003-00091-CCA-R3-PC**
**July 7, 2003**

-----

The petitioner, Charles Weston Elsea, Jr., appeals the trial court's denial of post-conviction relief. The single issue presented for review is whether he was denied the effective assistance of counsel at trial and on appeal. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Bill Speek, Chattanooga, Tennessee, for the appellant, Charles Weston Elsea, Jr.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In 1997, the petitioner was convicted of first degree felony murder, aggravated robbery, and setting fire to personal property. The testimony at trial established that the body of Ernest Wayne Heard was found at a boat ramp in Hamilton County. His automobile and a t-shirt, soiled with human blood and feces, were located about fifty feet away. Jerry Hawkins, who was in a separate vehicle, was also a victim of the attack, but managed to escape. His burned car was later found at another location. The petitioner confessed to the crimes in a conversation with a prison inmate, who testified in part as follows:

> He said . . . [he and his cousin] come up on two . . . vehicles that was parked
> and they went over to the first one and the guy was passed out and . . . they was
> planning on robbing him. And the guy woke up as they opened the door and the guy
> had a machete or a big knife, I'm not sure what it was, but he come out at [the
> petitioner's cousin] and [the petitioner] . . . hit the guy and knocked him down and
> pulled him out of the car and started kicking him in the head, and then [the

petitioner's cousin] started beating the guy with a rock or a brick, I'm not sure exactly what they used.

But after that was over with[, the petitioner] looked at the guy that they had beat up and killed, and seen that the guy's brains or his head was mutilated pretty bad and he said it made him have to use the bathroom. So he used the bathroom and took his shirt off which had blood on it and wiped his self when he was through . . . and left it laying there. And he said that the only thing that he knew that would hang him in this case would be fingerprints that he left on top of the car as he drug the guy out.

[A]fter that was over with there was another car sitting beside that car that had another guy in it. And that guy came to as the commotion went on about all of that happening and [the petitioner] and [his cousin] was afraid that the guy would identify them, so they knocked him out and left him laying there and they took his car to some . . . cemetery road or . . . old creek road, but they burnt his car and left the other guy – the guy that they murdered, his car remained there.

The petitioner received a sentence of life imprisonment without parole for the felony murder, eight years for the aggravated robbery, and one year for the setting fire to personal property. The sentences are to be served concurrently. On direct appeal, this court reduced the aggravated robbery charge to simple robbery and modified the sentence to three years. See State v. Charles W. Elsea, Jr., No. 03C01-9901-CR-00031 (Tenn. Crim. App., at Knoxville, Nov. 15, 1999). The remaining convictions and sentences were affirmed. Application for permission to appeal was denied by our supreme court on June 26, 2000.

Later, the petitioner filed a pro se petition for post-conviction relief alleging ineffective assistance of counsel. An attorney was appointed and an amended petition was filed. At the evidentiary hearing, trial counsel testified that he took over the defense of the case from another lawyer, whose entire case file he received; he also stated that he obtained all the discovery information he believed to be available. Trial counsel recalled that the defendant initially maintained that at the time of the murder, he and his cousin were on Mowbray Mountain where they had gotten into a fight with some people who had been drinking. He explained that he chose not to request DNA testing on the shirt found at the scene because the two victims had already been ruled out as potential donors of the blood. Trial counsel agreed that if a DNA test had excluded the defendant as a potential donor, it would have corroborated the defense theory, but testified that the risk of negative test results outweighed the potential benefits:

I guess it's a matter of tactics and one that I can assure you was discussed with [the petitioner], was what if it does come back and it's his blood, and, more importantly, since the shirt was used to wipe after someone defecated there at the scene, it would seem to me that that would be an awfully []damning piece of evidence were, in fact, it [the petitioner's] blood.

Trial counsel recalled that the petitioner never insisted that his blood was not on the shirt. He did not remember any request by the petitioner for DNA testing. According to trial counsel, DNA could not be extracted from the fecal matter on the shirt. He testified that the state connected the shirt to the petitioner by exhibiting a videotape showing him wearing a similar but "fairly blurry" shirt earlier on the night of the murder. A convenience store clerk remembered seeing blood on the petitioner and his cousin later that night.

Trial counsel recalled meeting with the petitioner and his family prior to trial "late into the night several times, after work." He stated that the petitioner's father proposed new defense theories "daily," but that they "vanished into thin air after some investigation." Counsel testified that he communicated with the petitioner adequately and thoroughly discussed the prospect of a plea agreement:

> I think the state's position was, that [the petitioner's cousin] was actually the person that probably did the most damage to [the victim].
>
> And I explained that to [the petitioner] and it was explained to me very quickly by Charles Elsea, his father, and eventually by [the petitioner], that there was a code among their family, they would not testify against anybody else in the family. Apparently Mr. Charles Elsea . . . had been in prison for some period of time and that was the code in the prison also, just don't testify against people.
> Q     But you had discussion specifically about him settling this case?
> A     I don't know if there were specific offers made, but I told him early on, and I think there were discussions, or at least discussions about offers, but that would require [the petitioner] to testify, and he would never testify.
> Q     Did he specifically say that he would not testify against [his cousin]?
> A     He asserted that, he was adamant about that . . . .

According to trial counsel, the state was not "necessarily eager" to offer a plea agreement, but "wanted [the petitioner's cousin] worse than [it] wanted [the petitioner]." It was his opinion that "because he wouldn't cooperate, [the petitioner] took the fall, and my understanding is [that his cousin] got a lesser plea."

Trial counsel acknowledged that he had been on vacation the weekend prior to the Tuesday trial but explained that he had taken his file and asserted that he was more than adequately prepared. He testified that his fee statement, which showed approximately four and one-half hours of pre-trial preparation time, represented less time than he had actually invested. Trial counsel remembered arranging for and conducting interviews of various out-of-town witnesses and questioning the investigating officers as examples of work for which he failed to seek compensation.

The petitioner testified that he met with trial counsel only twice prior to trial, once when counsel was first appointed, and once the day before trial when counsel brought a barber to the jail. He explained that his father made repeated telephone calls to his counsel due to the lack of

communication. The petitioner maintained that he never had any discussions with trial counsel regarding a defense strategy, possible DNA evidence, or plea negotiations. He insisted that he would have been "interested in hearing" of any plea proposal.

The post-conviction court denied the petition, finding that the petitioner had failed to demonstrate that trial counsel was ineffective. It specifically ruled that trial counsel had adequately been prepared for trial, had examined all documents and reports, and had "fought hard" on behalf of the petitioner. The post-conviction court determined that the state was unwilling to make any plea offer absent the petitioner's testimony and that the petitioner would not testify against "a family member." It also concluded that a serologist had determined that there was not enough blood on the t-shirt for a DNA profile so that the failure to request an analysis did not result in prejudice.

In this appeal, the petitioner contends that he was denied the right to effective assistance of trial counsel because counsel failed to adequately prepare for trial, failed to have further DNA testing performed on the shirt found at the scene, and failed to communicate settlement offers.

In a post-conviction proceeding, the petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Initially, the petitioner contends that his trial counsel was ineffective for failing to adequately prepare for trial. He asserts that his trial counsel's fee statement shows only 4.7 hours of preparation prior to trial and that counsel was on vacation the weekend prior to trial.

The post-conviction court found trial counsel to be thoroughly familiar with the case. It concluded that trial counsel offered a competent defense based on the facts of the case. In our view, the evidence does not preponderate against the finding that counsel was adequately prepared for trial. Trial counsel testified that he had interviewed relevant witnesses, including the investigating officers, traveled to the crime scene, and met with the petitioner and his family on numerous occasions. The record reflects that counsel filed pre-trial motions and the transcript of the trial demonstrates that counsel was prepared and effectively cross-examined the state's witnesses. That he did not bill the state for all of his pre-trial preparation time or that he was on vacation in the days prior to trial does not render his performance deficient.

Next, the petitioner asserts that his trial counsel was ineffective for failing to seek settlement offers from the district attorney. The post-conviction court found that there was no failure on the part of trial counsel regarding settlement offers in this case because the petitioner refused to testify for the state even if a favorable plea agreement was offered.

In our view, the record supports the determination that trial counsel was not deficient with regard to the pursuit or communication of settlement negotiations. Apparently, no specific offers were ever extended. The petitioner's testimony at the sentencing hearing establishes that he would not have accepted a plea offer in exchange for testimony against a family member under any circumstances.

Finally, the petitioner argues that his trial counsel's failure to seek additional DNA testing of the blood on the shirt found at the murder scene constitutes the ineffective assistance of counsel. Specifically, he asserts that "[a] reasonable probability exists that the blood on the shirt was not the [petitioner's] and such evidence could have been used to show that someone other than the [p]etitioner committed the crime." The state contends that any DNA testing would have been of little value to the petitioner.

In our view, the record supports the trial court's determination that the petitioner is not entitled to relief on this issue. Trial counsel testified that he made a strategic decision not to have further DNA testing performed on the shirt because he was concerned that the defense would be prejudiced if the petitioner were identified as a potential donor. The petitioner's own testimony at the sentencing hearing establishes that the petitioner was apparently less than confident that he would be excluded as a donor of the blood or feces on the shirt:

> The [t]-shirt that was used as an exhibit didn't match neither victim, but it was used because of a video. If I would have had DNA done, if it would have proved my innocence, or if would have proved my guilt, then I would have been guilty. . . .

Additionally, as trial counsel noted, exclusion of the petitioner as the donor of the blood on the shirt would not necessarily have excluded him as the owner of the shirt. Certainly it would not have exonerated him from the commission of the crime. Thus, the decision not to request additional DNA testing on the shirt was a reasonable defense strategy.

Likewise, the petitioner has not proved any prejudice resulting from the lack of additional DNA testing on the shirt. He has failed to submit any DNA test results that, if presented at trial, would have led to a different outcome. Moreover, at the sentencing hearing, the petitioner gave testimony acknowledging that the DNA results, even if favorable, would not have conclusively established his innocence:

> I think the nail was already in my coffin with or without DNA. I feel like the DNA could have proved a little bit more in my favor if it wasn't my DNA. If it was mine, then you're correct, it would have put a nail in the coffin and I would have got what I'm sitting here today with, a life sentence.

Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE